# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff/Respondent,

vs.                                    Cr. No. 13-3696 RB/KK
                                          (Civ. No. 17-1225 RB/KK)

MATTHEW DUKE MALEY,

      Defendant/Petitioner.

## MAGISTRATE JUDGE'S
## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Defendant/Petitioner Matthew Duke Maley's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 290) ("Section 2255 Motion"), filed December 13, 2017. On January 2, 2018, United States District Judge Robert Brack referred the case to me pursuant to 28 U.S.C. § 636(b)(1)(B) and (b)(3) and *Virginia Beach Federal Savings and Loan Association v. Wood*, 901 F.2d 849 (10th Cir. 1990). (Doc. 295.) Having meticulously considered the parties' submissions, the record, and the relevant law, and for the reasons set forth below, I recommend that Mr. Maley's Section 2255 Motion be DENIED.[1]

## I. Procedural History

A grand jury charged Mr. Maley, Aubrey Savage, and Jennifer Sanders with distributing methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2, in a two-count indictment filed in this Court on November 13, 2013. (Doc. 1.) The second count of the

---

[1] In recommending this disposition, I have considered the record in *United States v. Maley*, Cr. No. 14-637 FRZ-LAB (D. Ariz.) (hereinafter "Cr. No. 14-637"), as well as the record in this case. *See Williams v. Slater*, 317 F. App'x 723, 725 n.2 (10th Cir. 2008) (federal courts "may take judicial notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

indictment pertained to Mr. Maley, and charged that Mr. Maley and Ms. Sanders "unlawfully, knowingly and intentionally distributed . . . 50 grams and more of methamphetamine" on August 1, 2013 in Doña Ana County, New Mexico. (*Id.*) On the same date the indictment was filed, the Court issued a warrant for Mr. Maley's arrest, and the United States Federal Bureau of Investigation ("FBI") began searching for him in several states. (Doc. 163 at 51-52.)

As described in more detail below, New Mexico and Arizona law enforcement officers tried to execute the warrant for Mr. Maley's arrest in Tucson, Arizona on November 17, 2013. Although the officers did not find Mr. Maley that day, they did observe firearms and other incriminating items in plain view in his travel trailer, which they seized and towed to the Tucson FBI office. Two days later, United States Magistrate Judge Bernardo Velasco, sitting in Tucson, issued a search warrant for the trailer. (Doc. 341-1.) In executing the search warrant, officers discovered documents and additional firearms that the Government used against Mr. Maley at trial.

Mr. Maley was arrested in Las Cruces, New Mexico on December 4, 2013. (Doc. 165 at 200, 207, 213.) Jared Abrams and Steven Almanza entered appearances as Mr. Maley's counsel on December 6 and 19, 2013, respectively. (Docs. 6, 15.)

On March 19, 2014, a grand jury issued a fourteen-count superseding indictment in this case. (Doc. 48.) Six counts pertained to Mr. Maley, all charging conduct in Doña Ana County, New Mexico. (*Id.*) Count 1 charged Mr. Maley, Ms. Savage, and Ms. Sanders with conspiring to distribute 50 grams and more of methamphetamine from about June 7, 2013 through August 21, 2013, contrary to 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 21 U.S.C § 846. (*Id.* at 1-2.) Count 9 mirrored the second count of the original indictment. (*Id.* at 3.) Count 10 charged Mr. Maley and Ms. Sanders with distributing 50 grams and more of methamphetamine on August 21, 2013. (*Id.* at 4.) Count 11 charged Mr. Maley, Jose Luis Niño, and Candice Marie Carpenter with conspiring

to distribute 50 grams and more of methamphetamine on or about December 4, 2013.  (*Id.*)  Count 12 charged Mr. Maley, Mr. Niño, and Ms. Carpenter with possession with intent to distribute 50 grams and more of methamphetamine on or about December 4, 2013.  (*Id.*)  Finally, Count 14 charged Mr. Maley, a convicted felon, with possession of ten listed firearms from April through August 2013, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (*Id.* at 5-6.)

Mr. Abrams and Mr. Almanza moved to withdraw as Mr. Maley's counsel on July 15, 2014, six days before his trial was to begin.  (Docs. 83, 87.)  The next day, the Court continued the trial to September 22, 2014 and allowed Mr. Maley seven days in which to secure new counsel.  (Doc. 90 at 2; Doc. 112.)  On September 17, 2014, noting that no new counsel had entered an appearance on Mr. Maley's behalf, the Court denied Mr. Abrams' and Mr. Almanza's motion to withdraw.  (Doc. 128.)  Mr. Maley then moved the Court to continue the trial again, indicating that his counsel of choice was willing to represent him at trial and intended to enter an appearance but was unavailable to try the case on September 22, 2014.  (Doc. 129.)  On September 19, 2014, the Court denied Mr. Maley's motion to continue.  (Doc. 136.)

Mr. Maley's trial took place from September 22, 2014 to September 25, 2014.  (Doc. 141-42, 163-65, 167.)  Ms. Sanders, Mr. Niño, and Ms. Carpenter, all of whom had entered into plea agreements with the Government, testified against Mr. Maley.  (Doc. 164 at 128-72, 197-246; Doc. 165 at 101-40.)  At the conclusion of trial, the jury found Mr. Maley guilty of the crimes charged in Counts 1, 9, 11, 12, and 14 of the superseding indictment.  (Doc. 146.)  The Court granted Mr. Maley's motion for a judgment of acquittal as to Count 10.  (Doc. 149.)

The Court appointed Mary Stillinger to represent Mr. Maley at sentencing and on appeal on October 27, 2014.  (Doc. 154.)  On January 21, 2016, the Court sentenced Mr. Maley to 262 months' imprisonment on Counts 1, 9, 11, and 12, and 120 months' imprisonment on Count 14,

the terms to run concurrently for a total term of imprisonment of 262 months. (Doc. 193 at 3.) Mr. Maley appealed, arguing that the Court had deprived him of his right to be represented by his counsel of choice when it denied his September 17, 2014 request for a continuance. *United States v. Maley*, 681 F. App'x 685, 687 (10th Cir. 2017). The Tenth Circuit rejected this argument and affirmed Mr. Maley's conviction on March 9, 2017. *Id.* at 688.

Meanwhile, on April 2, 2014, a grand jury issued charges against Mr. Maley in the United States District Court for the District of Arizona. (Cr. No. 14-637, Doc. 1.) In that case, Mr. Maley was charged with one count of being a convicted felon in possession of several firearms, one count of possessing with intent to distribute less than five grams of methamphetamine, and one count of possessing several firearms in furtherance of a drug trafficking offense, all at or near Tucson, Arizona. (*Id.* at 1-5.) The indictment further provided for forfeiture of the listed firearms upon conviction. (*Id.* at 5-7.)

On November 7, 2016, in the District of Arizona, Mr. Maley filed a motion to suppress the evidence obtained from his trailer in November 2013. (Cr. No. 14-637, Doc. 30.) United States Magistrate Judge Leslie Bowman held an evidentiary hearing on the motion on February 1 and 13, 2017, and, on March 3, 2017, issued a Report and Recommendation ("Recommendation") in which she recommended that the motion be denied. (Cr. No. 14-637, Docs. 55, 61, 76, 78); *United States v. Maley*, 2017 WL 8941236, at *6 (D. Ariz. Mar. 3, 2017). Judge Bowman first concluded that officers' initial entry into Mr. Maley's trailer violated the Fourth Amendment because, although the officers had a warrant for his arrest, they did not have reason to believe he was in the trailer on the morning of November 17, 2013. *Maley*, 2017 WL 8941236 at *4-*5. However, Judge Bowman further concluded that the evidence obtained from the trailer was not subject to

suppression because it would inevitably have been discovered during an inventory search following officers' lawful seizure of the trailer pursuant to administrative forfeiture. *Id.* at *5-*6.

Mr. Maley filed an Objection to Judge Bowman's Recommendation on April 3, 2017, to which the Government responded on April 14, 2017. (Cr. No. 14-637, Docs. 84, 86, 87.) On May 8, 2017, United States District Judge Frank Zapata issued an order sustaining Mr. Maley's Objection and granting his motion to suppress. (Cr. No. 14-637, Doc. 93); *United States v. Maley*, 2017 WL 1830483 (D. Ariz. May 8, 2017). In his Order, Judge Zapata reviewed the portion of Judge Bowman's Recommendation regarding officers' initial entry into Mr. Maley's trailer for clear error because neither side had objected to it. *Maley*, 2017 WL 1830483 at *2. Judge Zapata found no clear error with respect to this portion of the Recommendation. *Id.*

However, in light of Mr. Maley's Objection, Judge Zapata reviewed the portion of Judge Bowman's Recommendation regarding the inevitable discovery doctrine *de novo*. *Id.* Judge Zapata rejected this portion of the Recommendation, holding that: (1) officers' seizure of Mr. Maley's trailer was unlawful under 18 U.S.C. § 981(b)(2); and thus, (2) a subsequent inventory search of the trailer would have been impermissible and the inevitable discovery doctrine did not apply to evidence obtained as a result of the seizure. *Id.* at *2-*5. Judge Zapata therefore concluded that "[t]he exclusionary rule prohibits the [G]overnment from introducing in its case-in-chief evidence obtained as a result of the agents' unlawful entry into and seizure of [Mr. Maley's] trailer." *Id.* at *5. On the Government's motion, the court dismissed the District of Arizona indictment against Mr. Maley on June 2, 2017. (Cr. No. 14-637, Docs. 95, 96.)

Mr. Maley filed the Section 2255 Motion at issue on December 13, 2017, *pro se*. (Doc. 290.) In his motion, Mr. Maley claims that: (1) his New Mexico trial counsel were constitutionally ineffective for failing to file a pre-trial motion to suppress evidence obtained as a result of officers'

entry into, and seizure and search of, his trailer; (2) officers' entry into, and seizure and search of, the trailer violated his Fourth Amendment rights; and, (3) his appellate counsel was constitutionally ineffective for failing to raise the suppression issue on direct appeal. (*Id.* at 13-21.) The Government responded in opposition to Mr. Maley's Section 2255 Motion on March 6, 2018, (Doc. 298); Mr. Maley filed a *pro se* reply in support of it on May 7, 2018, (Doc. 309); the Government filed a surreply on June 1, 2018, (Doc. 315); and, Mr. Maley filed a *pro se* surresponse on June 25, 2018. (Doc. 326.) The Government moved to strike Mr. Maley's surresponse on July 23, 2018, and that motion remains pending. (Doc. 329.)

The Court appointed Todd A. Coberly to represent Mr. Maley on December 10, 2018, (Doc. 342), and ordered supplemental briefing on December 11, 2018. (Doc. 343.) Mr. Maley filed a supplemental brief on March 11, 2019, (Doc. 350); the Government filed a supplemental response on May 1, 2019, (Doc. 357); and, Mr. Maley filed a supplemental reply on May 13, 2019. (Doc. 359.)

On June 17, 2019, the Court scheduled an evidentiary hearing for August 29, 2019, which it later continued to October 4, 2019 at Mr. Maley's request. (Docs. 364, 370, 371.) However, on September 23, 2019, the parties filed a Notice of Stipulation regarding whether the firearms admitted into evidence at Mr. Maley's trial were in plain view when officers entered Mr. Maley's trailer on November 17, 2013. (Doc. 376.) In the notice the parties stated that, given the stipulated facts, they did not believe that the evidentiary hearing scheduled for October 4, 2019 would be necessary. (*Id.* at 1.) Accordingly, the Court vacated the hearing. (Doc. 377.)

## II. Summary of Record Evidence Relevant to Mr. Maley's Section 2255 Motion[2]

### *Agent Acee's Testimony*

---

[2] I have not summarized redundant testimony on uncontested points for every witness.

Las Cruces FBI Agent Bryan Acee became aware of a methamphetamine investigation involving Ms. Savage in the spring of 2013, and began conducting undercover buys pursuant to the investigation in May or June 2013, through which he met Ms. Sanders in July 2013. (Doc. 163 at 5-6, 9, 21-22.) On July 11, 2013, officers conducting surveillance saw Ms. Savage and Ms. Sanders go to Mr. Niño's trailer to get methamphetamine to sell to Agent Acee. (Doc. 167 at 9-10, 17-18.)

On August 1, 2013, Ms. Sanders agreed to arrange for Agent Acee to buy methamphetamine from a local source named Matt. (Doc. 163 at 33, 35, 37-38, 45; Cr. No. 14-637, Doc. 61 at 11-12, 126.) Ms. Sanders directed Agent Acee to a white fifth-wheel travel trailer with blue striping located in space number three of Sunny Acres RV Park in Las Cruces, New Mexico.[3] (Doc. 163 at 33, 38, 45; Cr. No. 14-637, Doc. 61 at 11-13.) Agent Acee saw a black Dodge 1500 Ram pickup truck, a brownish Ford Crown Victoria, and an olive-green Range Rover parked by the trailer in space number three. (Cr. No. 14-637, Doc. 61 at 13, 49.) He gave Ms. Sanders around $9,000, which she took into the trailer. (Doc. 163 at 38-39; Cr. No. 14-637, Doc. 61 at 13-14.) While waiting in his vehicle, Agent Acee saw a man he later identified as Mr. Maley move the closed blinds and look out the trailer window. (Doc. 163 at 39; Cr. No. 14-637, Doc. 61 at 14-15.) Ms. Sanders returned from the trailer with 10 ounces of methamphetamine, which she gave to Agent Acee. (Doc. 163 at 39-41; Cr. No. 14-637, Doc. 61 at 15.)

The next morning, Agent Acee returned to Sunny Acres RV Park to collect license plate data. (Doc. 163 at 44; Cr. No. 14-637, Doc. 61 at 15-17.) He saw the same vehicles parked at space number three as he had the day before. (Cr. No. 14-637, Doc. 61 at 15-17.) He also saw Mr. Maley outside the trailer, cleaning or working on a bicycle. (Doc. 163 at 44; Cr. No. 14-637,

_____

[3] Space number three of Sunny Acres RV Park was about 80 to 100 yards from Mr. Niño's trailer, which was in an adjacent mobile home park at 1520 West Hadley, Las Cruces. (Doc. 163 at 101.)

Doc. 61 at 17.)   Agent Acee returned to the property again on August 5, 2013, when he saw the same three automobiles parked in different positions by the trailer.  (Cr. No. 14-637, Doc. 61 at 17-18.)

On August 5, 2013, at Agent Acee's direction, Doña Ana County Sheriff's Deputy Curtis Yarnell stopped the olive-green Range Rover.  (*Id.* at 18-19.)  The driver, its only occupant, was Sarah Stonestreet.  (*Id.* at 18-20.)  Ms. Stonestreet gave Deputy Yarnell a bill of sale indicating that Mr. Maley had purchased the trailer in space number three of Sunny Acres RV Park for $7,000. (*Id.*)  Deputy Yarnell saw the olive-green Range Rover again on August 6, 2013.  (*Id.* at 20-22.) Ms. Stonestreet was driving the vehicle, and Mr. Maley was a passenger.  (*Id.*)

The owners of Sunny Acres RV Park later informed Agent Acee that Ms. Stonestreet and Mr. Maley were renting space number three.  (*Id.* at 22.)   Agent Acee confirmed Mr. Maley's identity by way of a Colorado driver's license or identification card.  (*Id.*)  According to "records from New Mexico and Arizona," Mr. Maley last had "legitimate employment" in 2007.  (*Id.* at 22-23.)

Agent Acee participated in the coordinated arrests of a "couple dozen" persons involved in the methamphetamine investigation at issue on November 14, 2013.  (Doc. 163 at 51; Cr. No. 14-637, Doc. 61 at 26.)  However, officers could not arrest Mr. Maley because he had moved out of Sunny Acres RV Park before the "takedown" and left no forwarding address.  (Cr. No. 14-637, Doc. 61 at 26-27.)

Agent Acee "queried different databases" in "states in which [he] knew [Mr. Maley] had a history," and found that Mr. Maley had obtained an Arizona driver's license or identification card in late September 2013.  (*Id.* at 27-28.)  Agent Acee also found two vehicles registered to Mr. Maley in Arizona.  (*Id.*)  On both the driver's license or identification card and the vehicle

registrations, Mr. Maley listed his address as 1920 West Gardner Lane in Tucson. (*Id.*) Agent Acee's records search revealed that Mr. Maley's wife, Denise Maley, also lived at this address. (*Id.* at 73-74.) Arizona FBI agents who subsequently surveilled the property saw Mr. Maley's travel trailer, his pickup truck, and a Range Rover parked by a double-wide trailer there. (*Id.* at 28-29.) However, Agent Acee never heard that anyone saw Mr. Maley at the property. (*Id.* at 66.)

Agent Acee, Las Cruces FBI agents Greg Watterson and George Dougherty, and Deputy Yarnell traveled from Las Cruces to Tucson on November 16, 2013 to execute the warrant for Mr. Maley's arrest and seize Mr. Maley's vehicles. (*Id.* at 29-30, 64-65, 68, 127-28.) Doña Ana County Sheriff's Deputies Arnie Flores and Ernest DiMatteo also traveled from Las Cruces to Tucson to assist. (*Id.* at 64-65.) On November 16, 2013, Agent Acee went by 1920 West Gardner Lane, which was at the end of a one-lane dirt road, and saw Mr. Maley's trailer, his pickup truck, and a silver Range Rover parked there. (*Id.* at 29-30, 32.)

Around 9:00 a.m. on Sunday, November 17, 2013, the Las Cruces agents and officers, two or three Tucson FBI agents, and at least two local uniformed sheriff's deputies arrived at 1920 West Gardner Lane. (*Id.* at 30, 67, 69-70.) Mr. Maley's travel trailer, his pickup truck, and the silver Range Rover were parked by the double-wide trailer on the property. (*Id.* at 31.) The travel trailer's awnings were up, its stairs were down, its slide outs were extended to create more living space inside, the blinds were closed, and a surveillance camera in a window pointed at the area outside the trailer's front door. (*Id.* at 32, 52, 131.) An extension cord, a garden hose, and a flexible pipe attached to a septic outlet ran from the travel trailer to the double-wide trailer. (*Id.* at 32-33.) The pickup truck had a "towing package" on it. (*Id.* at 32.)

When officers arrived at 1920 West Gardner Lane, Mr. Maley's two adult sons were outside working on a car. (*Id.* at 33.) As officers took positions around the property, Agent Acee

heard Mr. Maley's sons shout a warning toward the double-wide trailer about law enforcement being present.  (*Id.* at 34, 36, 81.)  Agent Acee did not document this warning in his report.  (*Id.* at 82.)  Both of Mr. Maley's sons were handcuffed, detained, and put in sheriff's vehicles, and one of his sons, Tyler Maley, was arrested after officers learned he had an outstanding warrant.  (*Id.* at 34-35.)  Mr. Maley's sons told Agent Acee that Mr. Maley was not there but Agent Acee did not believe them.  (*Id.* at 123-24.)

Agent Acee and other officers entered the double-wide trailer and searched it for Mr. Maley but found no one inside.  (*Id.* at 36-37.)  They then determined that the travel trailer was locked.  (*Id.* at 37-38, 94.)  Agent Acee asked Mr. Maley's sons for the keys, without success.  (*Id.* at 37.)  Agents banged on the trailer and yelled, but no one came out, so Agents Acee, Watterson, and Dougherty and Deputy Yarnell breached the door and entered the trailer.  (*Id.* at 37-38.)  Agent Acee did not see or hear anyone in the trailer before entering it.  (*Id.* at 94.)  However, the blinds were closed and, in his experience, it is "not unusual" to hear nothing in a residence when executing an arrest warrant for a fugitive, because sometimes fugitives hide and remain still and quiet.  (*Id.* at 132.)

While searching the travel trailer for Mr. Maley, Agent Acee observed incriminating items in plain view, including suspected methamphetamine, U.S. currency, rounds of ammunition, two pistols, and a Mossberg 12-guage shotgun, the barrel of which he saw in the shower.  (*Id.* at 42, 47-48.)  The shotgun was later admitted into evidence at Mr. Maley's trial as Government's Exhibit 9.  (Doc. 376.)  Before he saw the firearms in plain view, Agent Acee knew that Mr. Maley was a convicted felon.  (Cr. No. 14-637, Doc. 61 at 47.)  At this point, Agent Acee decided to seize the travel trailer and obtain a warrant to search it.  (*Id.* at 47-49.)  He took photographs of the incriminating items in plain view to help him prepare the search warrant application.  (*Id.* at 110.)

He could have applied for a search warrant at that time but elected not to because he felt it would be unsafe for officers to remain at the property. (*Id.* at 112-13.)

Officers disconnected the trailer's water, power, and septic lines, and moved "[a] lot of stuff" inside the trailer to push the slide outs back in. (*Id.* at 49-50, 138.) They then hooked the trailer to Mr. Maley's pickup truck, towed it to the Tucson FBI office, and sealed it. (*Id.* at 49-50.) Agent Acee did not immediately complete the application for a warrant to search the trailer. (*Id.* at 50-51.) Rather, he first traveled back to Las Cruces to get more clothes and return the other officers who had traveled to Tucson with him. (*Id.*) On November 19, 2013, Agent Acee and other officers obtained a search warrant for Mr. Maley's trailer, which they executed at the Tucson FBI office, finding 30 firearms, methamphetamine, cocaine, marijuana, U.S. currency, ammunition, and drug packaging materials. (*Id.* at 51-52; Doc. 165 at 219-20; *see* Doc. 341-1.)

In December 2013, the FBI continued to try to locate Mr. Maley by covertly investigating persons Mr. Maley was suspected of supplying with methamphetamine. (Doc. 163 at 99-100.) One of these persons was Mr. Niño, from whom the FBI had been purchasing methamphetamine via a confidential informant. (*Id.* at 100.) In an effort to "draw [Mr. Maley] into the scene," the FBI directed the informant to try to purchase a larger amount of methamphetamine from Mr. Niño. (*Id.* at 100-01.) The informant reported that Mr. Niño did not have the methamphetamine yet but expected it from Tucson on December 4, 2013. (*Id.*) Agent Acee obtained a warrant to search Mr. Niño's residence, which he planned to execute after the person delivering the methamphetamine had arrived. (*Id.* at 101.) However, on December 4, 2013, Ms. Carpenter arrived at Mr. Niño's residence earlier than anticipated and left the residence before officers could execute the warrant. (*Id.* at 101-02.) Thus, officers stopped Ms. Carpenter's vehicle and simultaneously searched Mr. Niño's residence, finding a bag a methamphetamine at the residence. (*Id.* at 102.)

At trial the Court admitted eight of the firearms found in the trailer during the November 19, 2013 search into evidence as Government's Exhibits 7, 8, and 10 through 15. (Doc. 163 at 63-72.) Agent Acee chose the firearms that were admitted into evidence because Ms. Stonestreet remembered Mr. Maley possessing them when she and Mr. Maley lived together in New Mexico. (Doc. 165 at 220.)

### *Sarah Stonestreet's Testimony*

Ms. Stonestreet and Mr. Maley moved in with Mr. Niño in May 2013. (Doc. 164 at 31.) Mr. Maley was earning money selling methamphetamine and did not have a legitimate job. (*Id.* at 32, 39, 70-71.) He got the methamphetamine he sold from Tucson. (*Id.* at 32-33.) Mr. Maley sold methamphetamine to Mr. Niño, and Mr. Niño sold it to Ms. Sanders. (*Id.* at 32, 40.) Mr. Maley and Ms. Stonestreet stayed with Mr. Niño until July 3, 2013, when Mr. Maley bought a Sportsmen travel trailer and he and Ms. Stonestreet moved to Sunny Acres RV Park. (*Id.* at 33-34.) Mr. Maley purchased the trailer and a black Dodge Ram 1500 pickup truck with drug money, and traded drugs for an olive-green Land Rover and a Ford Crown Victoria. (*Id.* at 35-38.) Ms. Stonestreet recognized Government's Exhibits 7 through 15 as firearms Mr. Maley possessed when she and Mr. Maley lived together in New Mexico. (*Id.* at 54-57.)

### *Deputy Yarnell's Testimony*

On August 4, 2013, as part of the methamphetamine investigation involving Mr. Maley, Deputy Yarnell stopped a green Land Rover. (Doc. 164 at 84, 90-91.) Ms. Stonestreet was driving the vehicle and was its only occupant. (*Id.* at 91.) She could not find the vehicle's registration and handed Deputy Yarnell "a bunch of papers." (*Id.* at 92.) One of the papers was a bill of sale dated July 2013 for a 1999 Sportsmen travel trailer showing that Matt Maley had purchased the trailer for $7,000 cash. (*Id.* at 92-94.) Deputy Yarnell photographed the bill of sale before

returning it to Ms. Stonestreet. (*Id.*) On August 6, 2013, Deputy Yarnell observed Ms. Stonestreet and Mr. Maley in the green Land Rover. (*Id.* at 94-95.)

### *Deputy DiMatteo's Testimony*

Doña Ana County Sheriff's Deputy Ernest DiMatteo conducted surveillance during Agent Acee's undercover transactions with Ms. Savage and Ms. Sanders. (*Id.* at 104, 106-13.) Mr. Niño resided in a trailer in a park adjacent to Sunny Acres RV Park. (*Id.* at 120-22.) Officers saw Ms. Sanders go to this trailer during undercover transactions in July and August 2013. (*Id.* at 123.) The targets of the methamphetamine investigation at issue "initially became [sic] with Aubrey Savage, Jennifer Sanders to Mr. Cox, Rick Cox, to Mr. Jose and Jesus Niño, and ultimately to Mr. Maley." (*Id.*)

### *Jennifer Sanders' Testimony*

In 2013, Mr. Niño supplied methamphetamine to Ms. Sanders, and Ms. Sanders supplied it to Ms. Savage. (*Id.* at 135-36, 137-38.) On August 1, 2013, Ms. Sanders arranged for Agent Acee, who was acting undercover without her knowledge, to buy methamphetamine from Mr. Maley and Ms. Stonestreet. (*Id.* at 142-46.) They drove to the trailer where Mr. Maley and Ms. Stonestreet resided; Ms. Sanders went inside and obtained 10 ounces of methamphetamine from Mr. Maley and Ms. Stonestreet; and, Ms. Sanders came back out and gave the methamphetamine to Agent Acee. (*Id.*) Mr. Maley was unhappy on this occasion and told Ms. Sanders he knew she did business with Mr. Niño and she should not bypass him again. (*Id.* at 145-46, 165-66.)

### *Candice Carpenter's Testimony*

Ms. Carpenter entered into a plea agreement with the Government in this case. (*Id.* at 201.) The plea agreement was admitted into evidence, and Ms. Carpenter confirmed that in it she agreed to testify truthfully and completely about her participation in and knowledge of criminal activities.

(*Id.* at 203-05.)  Mr. Maley's trial counsel cross-examined Ms. Carpenter about the plea agreement and the benefits she received as a result of it.  (*Id.* at 237-39, 243-45.)

Ms. Carpenter reconnected with Mr. Maley in Arizona in September 2013 and accompanied Mr. Maley on trips to deliver drugs to Mr. Niño that fall.  (*Id.* at 208, 211-16.)  One such trip began on November 15, 2013, when Ms. Carpenter, Mr. Maley, and his daughter drove a green Land Rover to Albuquerque to meet Mr. Maley's brother after delivering drugs to Mr. Niño in Las Cruces.  (*Id.* at 213-16.)

On December 5, 2013, Ms. Carpenter drove to Las Cruces to deliver drugs to Mr. Niño for Mr. Maley.[4]  (*Id.* at 221, 229.)  When she arrived in Las Cruces, she met Mr. Maley at a hotel and he took some of the drugs.  (*Id.* at 221-23.)  Afterward she delivered the remainder of the drugs to Mr. Niño, who then accompanied her to an auto parts store.  (*Id.* at 223.)  On the way back officers pulled them over, arrested Mr. Niño, detained and questioned Ms. Carpenter, and searched her and Mr. Maley's hotel room.  (*Id.* at 223-25, 230.)  In the course of this encounter Ms. Carpenter told officers where they might find Mr. Maley.  (*Id.* at 230-31.)

### *Jose Niño's Testimony*

Mr. Niño entered into a plea agreement with the Government in this case.  (Doc. 165 at 122.)  The plea agreement was admitted into evidence, and Mr. Niño confirmed that in it he agreed to testify for the Government.  (*Id.* at 122-23.)  Mr. Maley's trial counsel cross-examined Mr. Niño about the plea agreement and the benefits he received as a result of it.  (*Id.* at 131-36.)  Counsel

---

[4] Ms. Carpenter testified that these events occurred on December 5, 2013.  (Doc. 164 at 221-25, 229-31.)  Other witnesses who testified about them attested that they occurred on December 4, 2013.  (*See, e.g.*, Doc. 163 at 101-04 (Agent Acee); Doc. 165 at 179-84, 188-90, 198-200 (Agent Watterson); *id.* at 207-13 (Agent Dougherty).)  It seems more likely that the events occurred on December 4, 2013; however, the difference is immaterial to the issues presented here.

also cross-examined Mr. Niño regarding his 2004 conviction for possession with intent to distribute cocaine.  (*Id.* at 126.)

Mr. Maley and Ms. Stonestreet moved in with Mr. Niño in April or May 2013.  (*Id.* at 105-06.)  Around this time, Mr. Niño began using and selling more methamphetamine.  (*Id.* at 106-08.)  Mr. Maley sold methamphetamine to Mr. Niño, and Mr. Niño sold it to Ms. Sanders.  (*Id.* at 107. 112-13. 117.)  Mr. Maley continued to sell methamphetamine to Mr. Niño after he moved to Arizona.  (*Id.* at 111, 117.)  After the move, Mr. Maley and Ms. Carpenter delivered methamphetamine to Mr. Niño five or six times, including once in mid-November when they were traveling in a green Land Rover with Mr. Maley's daughter.  (*Id.* at 113-15.)

### ***Agent Watterson's Testimony***

Agent Watterson conducted surveillance in support of the methamphetamine investigation involving Mr. Maley.  (*Id.* at 140; Cr. No. 14-637, Doc. 76 at 14-15.)  When he surveilled the olive-green Range Rover associated with Mr. Maley's trailer, Ms. Stonestreet was driving it.  (Cr. No. 14-637, Doc. 76 at 15-16.)  On July 1, 2013, Agent Watterson observed Ms. Savage and Ms. Sanders enter the trailer park where Mr. Niño lived, stay there for ten to fifteen minutes, and proceed to an undercover transaction with Agent Acee.  (Doc. 165 at 151-53, 201-02.)

In November 2013, Agent Watterson learned that Mr. Maley had listed 1920 West Gardner Lane as his address on his Arizona driver's license or identification card and vehicle registrations, and that his wife was "listed on the property as well."  (Cr. No. 14-637, Doc. 76 at 16, 34, 40.)  Agent Watterson contacted Tucson FBI Agent Jordan Kuretich and asked him to drive by the property.  (*Id.* at 16-17.)  Based on the information Agent Kuretich provided, Agent Watterson determined that Mr. Maley's trailer and several of his vehicles were at 1920 West Gardner Lane.  (*Id.* at 18, 31.)  However, nobody physically observed Mr. Maley at that address.  (*Id.* at 40-41.)

Agent Watterson traveled from Las Cruces to Tucson on November 16, 2013 and drove by 1920 West Gardner Lane on that date.  (*Id.* at 18-19.)  He saw the trailer in which Mr. Maley had resided in Las Cruces, as well as the pickup truck previously parked by the trailer.  (*Id.* at 19.)  He also saw a silver Land Rover.  (*Id.*)

Agent Watterson participated in the attempt to arrest Mr. Maley at 1920 West Gardner Lane on November 17, 2013.  (*Id.* at 16, 19-20.)  When officers arrived and fanned out, Mr. Maley's sons yelled as if they were yelling to someone inside the doublewide trailer.  (*Id.* at 21, 35-37.)  Agent Watterson helped to search the doublewide and travel trailers for Mr. Maley.  (*Id.* at 21-23.)  He heard no response or movement inside the travel trailer after officers knocked and announced.  (*Id.* at 43.)  The window coverings were shut and there was a surveillance camera pointing at the door.  (*Id.* at 43-44.)  He saw no contraband in plain view in the section of the travel trailer he cleared.  (*Id.* at 24.)  It took "a little while" to hook the travel trailer to the pickup truck for towing, disconnect the water, electric, and sewer lines, and retract the trailer's slide out.  (*Id.* at 24-25.)  The officers did not have any documents with them authorizing the administrative forfeiture of Mr. Maley's assets.  (*Id.* at 55.)

Other agents had conducted controlled drug buys from Mr. Niño using a confidential informant.  (Doc. 165 at 179.)  Through the informant, agents learned that Mr. Niño was expecting a drug shipment on December 4, 2013.  (*Id.* at 179-80.)  The agents set up surveillance at Mr. Niño's residence and got a warrant to search it.  (*Id.*)   On December 4, 2013, Agent Watterson participated in the search of Mr. Niño's residence, during which officers found narcotics.  (*Id.* at 182-83.)  Agent Watterson then proceeded to the hotel room where Ms. Carpenter and Mr. Maley were staying.  (*Id.* at 184.)  Deputies DiMatteo and Flores brought Ms. Carpenter to the room, and Agent Watterson and other officers interviewed her for a couple of hours.  (*Id.* at 188-89, 199.)

Ms. Carpenter informed them that Mr. Maley might be at 1234 Willow Street. (*Id.* at 199-200.) Mr. Maley was later apprehended at that address. (*Id.* at 200.)

### *Agent Dougherty's Testimony*

Agent Dougherty participated in the search of Mr. Niño's trailer on December 4, 2013, in which officers found suspected methamphetamine. (*Id.* at 208-09.) He also participated in clearing the hotel room in which Mr. Maley and Ms. Carpenter were staying on that date. (*Id.* at 209-10.) Acting on information received from Agent Watterson, Agent Dougherty then went to 1234 North Willow Street in Las Cruces and observed a person matching Mr. Maley's description enter the residence. (*Id.* at 211-12.) Agent Dougherty knocked on the door and asked the woman who answered through the door to "[t]ell Matthew Maley to come outside now." (*Id.* at 212-13.) Mr. Maley came outside and confirmed his identity, and Agent Dougherty arrested him. (*Id.* at 213.)

### *Agent Kuretich's Testimony*

New Mexico FBI agents asked Agent Kuretich to conduct drive-by surveillance at 1920 West Gardner Lane in Tucson, and to look for a black pickup truck, a Land Rover, and a travel trailer. (Cr. No. 14-637, Doc. 76 at 59, 61.) On November 8, 2013, Agent Kuretich saw a black pickup truck, a travel trailer, a silver Land Rover, "a few other vehicles," and a doublewide trailer at the address. (*Id.* at 60-61.) The property was located off a one-way dirt road in a trailer park. (*Id.* at 62.) Agent Kuretich returned to the property the following day, when he noted that the travel trailer was up on a block, its awning and slide out were extended, and a couple of the vehicles were parked in different positions in the driveway. (*Id.* at 62-64.) Agent Kuretich saw no one on the property during his surveillance. (*Id.* at 71, 73.) However, based on the number of vehicles and the fact that some of them had moved, he assumed that someone was residing there. (*Id.* at

73.)  Agent Kuretich's surveillance was "fairly quick" on both occasions because the neighborhood was "not set up in a good way for a surveillance," and he was short-staffed.  (*Id.* at 70, 85.)

Agent Kuretich participated in officers' attempt to arrest Mr. Maley at 1920 West Gardner Lane on November 17, 2013.  (*Id.* at 64-65.)  The trailer remained up on a block with the awning and slide out extended, and a power cord and hoses were attached to it.  (*Id.* at 68-69.)  The trailer windows were covered and it was not possible to see through them.  (*Id.* at 69-70.)  Agent Kuretich did not recall Mr. Maley's sons yelling or shouting.  (*Id.* at 75.)  However, other agents had already made contact with them when he arrived at the property.  (*Id.* at 85-86.)

Agent Acee prepared the search warrant application for Mr. Maley's trailer and Agent Kuretich added his history and observations before presenting it to the judge.  (*Id.* at 80.)

### ***Tyler Maley's Testimony***

Tyler Maley ("Tyler") is Mr. Maley's son.  (*Id.* at 89-90.)  Tyler's mother and brother live at 1920 West Gardner Lane, and Tyler stayed there overnight from November 16 to 17, 2013.  (*Id.* at 90, 96.)  At around 9:00 a.m. on November 17, 2013, he and his brother were about to start work on his truck when officers arrived.  (*Id.* at 91.)  The officers said they had a warrant for Mr. Maley's arrest but they refused to show it.  (*Id.* at 93, 95.)  Tyler's brother shouted in the direction of the doublewide trailer not to say anything until they get a lawyer.  (*Id.* at 96, 103-04.)  He was shouting to their mother even though she was not there.  (*Id.*)  Before entering the doublewide trailer, the officers announced themselves as FBI and asked Mr. Maley to please show himself.  (*Id.* at 98.)  They asked Tyler and his brother for the keys to the travel trailer, but Tyler and his brother did not comply.  (*Id.* at 99.)  They informed the agents that Mr. Maley was not there as soon as the agents arrived.  (*Id.*)

### ***Stipulations***

At the hearing before Judge Bowman, the Government and Mr. Maley stipulated that, on or after November 18, 2013, United States Border Patrol Agent Edmundo Rivera, Jr., informed agents trying to locate Mr. Maley that Mr. Maley's 2000 Land Rover Discovery was photographed traveling north on I-25 between Las Cruces and Albuquerque on November 15, 2013. (*Id.* at 10-12.)

On September 23, 2019, the Government and Mr. Maley stipulated that: (1) "[t]he Mossberg 12 gauge shotgun entered into evidence at Mr. Maley's trial as Government Exhibit 9 was in plain view in the shower area of Mr. Maley's RV when agents entered the RV on November 17, 2013"; and, (2) none of the other firearms entered into evidence at Mr. Maley's trial were in plain view. (Doc. 376 at 1.)

### III. <u>Standard of Review</u>

Pursuant to 28 U.S.C. § 2255, a federal prisoner who

> claim[s] the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). Section 2255 relief is available only if "the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quotation marks omitted) (superseded by statute on other grounds). Courts must presume "that the proceedings leading to the conviction were correct"; the burden is on the movant to demonstrate otherwise. *Klein v. United States*, 880 F.2d 250, 253 (10th Cir. 1989) (citing *United States v. Morgan*, 346 U.S. 502, 512 (1954)). Section 2255 requires district courts to hold an evidentiary hearing on a prisoner's motion "[u]nless the motion and the

files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

The Sixth Amendment to the United States Constitution guarantees the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate both that: (1) counsel's representation fell below an objective standard of reasonableness; and, (2) the deficient performance prejudiced the defense. *Id.* at 687-88; *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). In other words, a defendant alleging ineffective assistance of counsel must show both "incompetence and prejudice." *Kimmelman*, 477 U.S. at 381. "Courts are free to address these two prongs in any order, and failure under either is dispositive." *United States v. Barrett*, 797 F.3d 1207, 1214 (10th Cir. 2015).

Regarding the first *Strickland* prong,

> [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 466 U.S. at 689. Judicial review of counsel's performance is "highly deferential," *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011), and a defendant must overcome the strong presumption that his counsel rendered adequate assistance and "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.*

Regarding the second *Strickland* prong, to demonstrate that counsel's failure to file a motion to suppress prejudiced him, "the defendant must . . . prove that his Fourth Amendment

claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman*, 477 U.S. at 375.

> Although a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim like respondent's, a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief. Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial without the challenged evidence.

*Id.* at 382.

## IV. <u>Analysis</u>

### A.     <u>Trial counsel's failure to file a motion to suppress did not prejudice Mr. Maley</u>.

Mr. Maley claims that his trial counsel were constitutionally ineffective because they failed to file a motion to suppress evidence obtained as a result of officers' initial entry into, and subsequent seizure and search of, his trailer.  (Doc. 290 at 14-17; Doc. 309 at 1-14.)  Tracking the District of Arizona decisions regarding the suppression motion he filed in that court, Mr. Maley argues that officers' entry into and seizure and search of the trailer violated the Fourth Amendment, and that a motion to suppress filed in this case would have been meritorious and would have led to the exclusion at trial of all evidence obtained as a result of the officers' unlawful actions.  (*Id.*) Mr. Maley further argues that the verdict against him would have been different had this evidence been excluded.  (*Id.*)  Mr. Maley's claim raises a number of discrete issues, which I will address in turn.

#### 1.     <u>A motion to suppress evidence obtained as a result of officers' entry into Mr. Maley's trailer would have lacked merit</u>.

Mr. Maley argues that his trial counsel should have filed a motion to suppress evidence obtained as a result of officers' initial entry into his trailer on November 17, 2013, because the entry violated the Fourth Amendment.  The Government responds that the entry was lawful

because its purpose was to execute a warrant for Mr. Maley's arrest. (Doc. 298 at 9; Doc. 357 at 4-5.) In *Payton v. New York*, the Supreme Court held that, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U.S. 573, 603 (1980). There is "a circuit split as to the showing necessary to satisfy *Payton*'s 'reason to believe' standard, with some courts equating reason to believe to probable cause and others holding that reason to believe is a lesser standard." *United States v. Bohannon*, 824 F.3d 242, 253 (2d Cir. 2016).

The appellate courts for the Second, Tenth, and District of Columbia Circuits have concluded that *Payton*'s "reason to believe" standard refers to something less than probable cause. *Id.* (citing *United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005), *reh'g in part on other grounds*, 179 F. App'x 60 (D.C. Cir. 2006); *Valdez v. McPheters*, 172 F.3d 1220, 1227 n. 5 (10th Cir. 1999); *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995)). "The logic behind these decisions is simple enough: the Supreme Court in *Payton* used a phrase other than 'probable cause' because it meant something other than 'probable cause.'" *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014) (Gorsuch, J.) (quotation marks omitted). In contrast, "the Third, Fifth, and Ninth Circuits have construed *Payton*'s reasonable-belief standard as equivalent to probable clause." *Bohannon*, 824 F.3d at 254 (citing *United States v. Vasquez-Algarin*, 821 F.3d 467, 480 (3d Cir. 2016); *United States v. Barrera*, 464 F.3d 496, 501 & n. 5 (5th Cir. 2006); *United States v. Gorman*, 314 F.3d 1105, 1114–15 (9th Cir. 2002)).

To date, the First, Sixth, Seventh, and Eleventh Circuits have ruled less conclusively on the issue. *Id.* (citing *United States v. Hamilton*, 819 F.3d 503, 506 n. 5 (1st Cir. 2016) (assuming without deciding that "reasonable belief is a lesser standard than probable cause" and concluding

that evidence satisfied probable-cause standard); *United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009) (declining to "decide whether reasonable belief requires probable cause or something less" because "police had enough evidence to easily satisfy a probable cause standard") (internal quotation marks omitted); *United States v. Hardin*, 539 F.3d 404, 416 & n. 6 (6th Cir. 2008) (declining to decide whether "lesser reasonable-belief standard applies" because officers' belief did not satisfy even that lower standard, but stating in dicta that probable cause is correct standard); *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995) ("[I]t is difficult to define the *Payton* 'reason to believe' standard, or to compare the quantum of proof the standard requires with the proof that probable cause requires.")).

Notably, in *Denson*, the Tenth Circuit queried whether "reason exists to reconsider" its determination that *Payton*'s "reason to believe" standard refers to something less than probable cause, in light of the circuit split and the fact that "the Supreme Court itself has sometimes seemed to employ the term 'reasonable ground for belief' as part of the very definition of 'probable cause.'" *Denson*, 775 F.3d at 1217. However, the *Denson* court concluded that it did not need to decide the question in the case before it because "nothing turn[ed] on its answer. Even if the officers needed probable cause to think [the defendant] was inside the home at the time of their entry, they had it." *Id.*

It is unclear whether the Court should apply Ninth or Tenth Circuit caselaw to assess the merits of the suppression motion Mr. Maley claims his trial counsel should have filed. In general, of course, this Court must follow Tenth Circuit law. *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits."); *State of N.M. v. Dep't of Interior*, 269 F. Supp. 3d 1145, 1152 (D.N.M. 2014) ("Binding precedent for all is set only by

the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit."); *Gonzales v. Passino*, 222 F. Supp. 2d 1277, 1281 (D.N.M. 2002) ("This Court, of course, is bound by Tenth Circuit precedent.")

However, several district courts have held that where, as here, a court in one circuit is considering the propriety of law enforcement officers' actions in another circuit, the court should apply the law of the circuit where the officers' challenged conduct occurred, *i.e.*, the "lex loci." *See, e.g.*, *United States v. Kennedy*, No. CRIM. 13-240, 2014 WL 6090409, at *5 (W.D. Pa. Nov. 13, 2014) (Sixth Circuit law applied to search and seizure that occurred in Sixth Circuit but was challenged in Third Circuit); *United States v. Gates*, No. CRIM. 08-42-P-H, 2008 WL 5382285, at *7 (D. Me. Dec. 19, 2008), *aff'd*, 709 F.3d 58 (1st Cir. 2013) (Fourth Circuit law applied to traffic stop that occurred in Fourth Circuit but was challenged in First Circuit); *United States v. Barragan*, 589 F. Supp. 2d 1012, 1015–16 (S.D. Ind. 2008) (Ninth Circuit law applied to electronic surveillance that occurred in Ninth Circuit but was challenged in Seventh Circuit); *United States v. Longo*, 70 F. Supp. 2d 225, 261 (W.D.N.Y. 1999) (Sixth Circuit law applied to electronic surveillance that occurred in Sixth Circuit but was challenged in Second Circuit); *United States v. Gerena*, 667 F. Supp. 911, 914-24 (D. Conn. 1987) (First Circuit law applied to electronic surveillance that occurred in First Circuit but was challenged in Second Circuit); *see also United States v. Ozuna*, 129 F. Supp. 2d 1345, 1354 (S.D. Fla. 2001), *aff'd*, 48 F. App'x 739 (11th Cir. 2002) (adopting "lex loci" approach in cases involving conflicts among federal circuits). In choosing to follow the lex loci approach, courts have generally reasoned that officers should be able to rely on their understanding of the law as their circuit has interpreted it. *Kennedy*, 2014 WL 6090409 at *5; *Gates*, 2008 WL 5382285 at *7; *Ozuna*, 129 F. Supp. 2d at 1354; *Gerena*, 667 F. Supp. at 918; *see also United States v. Restrepo*, 890 F. Supp. 180, 191 (E.D.N.Y. 1995) (where

parties raise "problem of inter-circuit conflicts of law," lex loci approach is "sensible" because officers should be able to rely on their understanding of the law in their circuit); *cf. Barragan*, 589 F. Supp. 2d at 1015–16 (applying lex loci as law of "the forum where the warrant was authorized").

In the present matter, the officers' challenged conduct occurred in Arizona, which would seem to indicate that the Court should apply Ninth Circuit law to determine its propriety. However, about half of the officers who engaged in the challenged conduct were employed in New Mexico; the arrest warrant the officers were attempting to execute was issued in New Mexico; and, the investigation leading to the arrest warrant's issuance occurred in New Mexico. These circumstances muddy the waters regarding which law should apply. Arguably, New Mexico officers who tried to execute a New Mexico arrest warrant arising out of a New Mexico investigation should have been able to rely on their understanding of the law as the Tenth Circuit has interpreted it.

However, I need not decide which law to apply because the difference between Ninth and Tenth Circuit law is immaterial here. *Compare Gorman*, 314 F.3d at 1114–15 *with Valdez*, 172 F.3d at 1227 n.5. As explained below, officers' initial entry into Mr. Maley's trailer was lawful even under the Ninth Circuit's more demanding precedent. *See Ozuna*, 129 F. Supp. 2d at 1352 ("Because I find that there was no constitutional violation even under the apparently more demanding [circuit's] precedent, it is unnecessary to engage in a choice-of-law determination at this stage of the analysis.") More specifically, "[e]ven if the officers needed probable cause to think [Mr. Maley] was inside the [trailer] at the time of their entry, they had it." *Denson*, 775 F.3d at 1217.

As the Supreme Court has observed,

[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of

legal rules. The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.

*Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003) (citation and quotation marks omitted).

Nevertheless, controlling precedent does provide some guidance regarding the standard's requirements. "Probable cause is not a high bar." *D.C. v. Wesby*, — U.S. —, 138 S. Ct. 577, 586 (2018) (quotation marks omitted). It

doesn't require proof that something is more likely true than false. It requires only a "fair probability," a standard understood to mean something more than a "bare suspicion" but less than a preponderance of the evidence at hand. When assessing whether the government meets the probable cause standard we look to the "totality of the circumstances."

*Denson*, 775 F.3d at 1217 (quoting *United States v. Ludwig*, 641 F.3d 1243, 1248, 1252 & n.5 (10th Cir. 2011) and *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Thus, those circuits applying a probable cause standard in the *Payton* context have asked whether officers' information established a fair probability under the totality of the circumstances that the arrestee was residing at and present within a dwelling when the officers tried to execute an arrest warrant there. *Id.*; *United States v. Garibay*, 334 F. App'x 91, 92 (9th Cir. 2009); *United States v. Godbey*, 208 F. App'x 567, 568 (9th Cir. 2006).

*Payton*'s "reason to believe" standard—whether it differs from probable cause or not—is common-sense and fact-specific. *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007); *Anderson v. Campbell*, 104 F.3d 367, at *3 (10th Cir. 1996) (unpublished). As such, it would be impossible to list every consideration that might support or negate a finding that there is reason to believe an arrestee will be found at home at a particular time. However, considerations the Ninth and Tenth Circuits have recognized include: the presence of an automobile at the residence, *United States v. Thompson*, 402 F. App'x 378, 385-86 (10th Cir. 2010); *Valdez*, 172 F.3d at 1226; *United States v. Morehead*, 959 F.2d 1489, 1496 (10th Cir.), *on reh'g sub nom. United States v. Hill*, 971

F.2d 1461 (10th Cir. 1992); *United States v. Litteral*, 910 F.2d 547, 554 (9th Cir. 1990); the day of the week and the time of day, *Denson*, 775 F.3d at 1217; *Godbey*, 208 F. App'x at 568; *Thompson*, 402 F. App'x at 386; *Diaz*, 491 F.3d at 1078; *Valdez*, 172 F.3d at 1226; the verbal and nonverbal cues of other persons present at the residence, *Thompson*, 402 F. App'x at 386; observations regarding lights or other electrical devices, *Denson*, 775 F.3d at 1217–18; *Valdez*, 172 F.3d at 1226; the circumstances of the suspect's employment, *Denson*, 775 F.3d at 1217; *Diaz*, 491 F.3d at 1078; *Valdez*, 172 F.3d at 1226; and, an absence of evidence that the suspect is elsewhere. *Denson*, 775 F.3d at 1217; *Valdez*, 172 F.3d at 1226.

"People draw 'reasonable' conclusions all the time without direct evidence." *Diaz*, 491 F.3d at 1078. Thus, in both the Ninth and Tenth Circuits, officers may have reason to believe that an arrestee is present within a residence even though he or she has not actually been seen there. *See, e.g., id.* (officers had probable cause to believe defendant was in his house even though there were "some signs that [he] might be gone" and "[a]gents did not see [him] on his property"); *United States v. Gay*, 240 F.3d 1222, 1227 (10th Cir. 2001) ("[O]fficers are not required to actually view the suspect on the premises" and "may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts.") (citing *Valdez,* 172 F.3d at 1226).

Here, the information known to officers when they entered Mr. Maley's trailer on November 17, 2013 established a fair probability that Mr. Maley resided and would be found in the trailer at that time.[5] Officers had very strong evidence that Mr. Maley resided in the trailer.

---

[5] Mr. Maley does not dispute that officers had probable cause to believe he resided in the travel trailer at 1920 West Gardner Lane on November 17, 2013. (*See generally* Docs. 290, 309, 350, 359); *see also Maley*, 2017 WL 8941236 at *5 (Bowman, J.) (finding it reasonable for officers to assume Mr. Maley was residing in the travel trailer). Rather, he disputes that officers had probable cause to believe he would be found within the trailer on that date. (Doc. 290 at 15; Doc. 309 at 6-8; Doc. 350 at 4-6; Doc. 359 at 2.) However, the factors relevant to these two issues overlap to some degree, and I will thus address them both.

They saw Mr. Maley inside the trailer during an undercover drug buy on August 1, 2013 and outside it cleaning a bicycle the following day. Later in August 2013, they photographed a bill of sale documenting his purchase of the trailer and confirmed that he and Ms. Stonestreet were renting the space where it was then situated. They saw vehicles registered to Mr. Maley parked by the trailer in both Las Cruces and Tucson, and in both cities the positions of these vehicles changed over time, indicating that someone was driving them. In November 2013, officers learned that Mr. Maley had listed the Tucson address to which the trailer had been moved as his address on his Arizona driver's license or identification card, and also on his vehicle registrations. They further learned that his wife resided at the same address. In sum, officers had more than ample reason to believe Mr. Maley was residing in the trailer in November 2013.

In addition, the totality of the circumstances known to officers when they entered Mr. Maley's trailer on November 17, 2013 established a fair probability that they would find him within it at that time. First, officers entered the trailer on a Sunday at 9:00 a.m., a day and time when people are generally at home.[6] Second, officers knew that Mr. Maley had been unemployed since 2007, making it unlikely that he would be away at work that morning. Third, there were three vehicles parked by Mr. Maley's trailer when officers arrived, including the pickup truck previously parked by the trailer in Las Cruces. These vehicles had changed positions in the days leading up to November 17, 2013, indicating that someone was driving them. Fourth, the trailer's set-up showed that it was in active use as a residence: it was on blocks; its stairs, awnings, and slide-outs were extended; and, it was connected to power, water, and a septic system.

---

[6] The Court recognizes that many people attend religious services on Sunday mornings; however, given the information officers had about Mr. Maley's lifestyle, it was reasonable for them to believe he would not be at church on the morning of November 17, 2013.

Fifth, there was a substantial likelihood that Mr. Maley knew officers were looking for him and was avoiding them. He had moved away from Las Cruces in September 2013 and left no forwarding address. A number of persons associated with the criminal investigation implicating him were arrested in a "takedown" on November 14, 2013. The trailer's blinds were drawn and a surveillance camera pointed at its entrance. Mr. Maley's likely awareness of his fugitive status "too made it incrementally more likely that he would be holed up at home rather than out and about." *Denson*, 775 F.3d at 1217.

Sixth, by shouting a warning when officers arrived at 1920 West Gardner Lane, Mr. Maley's sons communicated their belief that another person was inside one of the structures on the property that morning.[7] And finally, on the morning of November 17, 2013, officers lacked information that Mr. Maley was somewhere other than his residence.[8] "[I]n isolation none of these facts may mean much. Even together they hardly prove [Mr. Maley was] at home. But in combination . . . they are enough to establish probable cause (a fair probability) for such a conclusion." *Denson*, 775 F.3d at 1218.

Mr. Maley argues that officers nevertheless lacked probable cause to believe he would be found within his trailer on the morning of November 17, 2013. However, the facts on which he relies fail to vitiate probable cause. (Doc. 350 at 5-6.) The fact that Mr. Maley had not been seen at 1920 West Gardner Lane fails to vitiate probable cause because "[p]eople draw 'reasonable' conclusions all the time without direct evidence." *Diaz*, 491 F.3d at 1078. Equally ineffectual are the facts that officers saw and heard no activity in the trailer and that the trailer door was locked.

---

[7] In her Recommendation, Judge Bowman noted that Agent Acee did not document this warning in his report. *Maley*, 2017 WL 8941236 at *2. However, the fact of it cannot seriously be disputed; Agents Acee and Watterson and even Tyler Maley himself testified to it.

[8] On November 18, 2013, officers learned that the olive-green Land Rover they had seen Ms. Stonestreet driving was photographed at a checkpoint between Las Cruces and Albuquerque on November 15, 2013. However, they did not have this information when they entered Mr. Maley's trailer on November 17, 2013.

Mr. Maley had reason to suspect that officers were looking for him; as such, and as Agent Acee testified, it would not have been unusual for him to hide in his locked trailer and remain still and quiet. That Mr. Maley's green Land Rover was not parked by the trailer likewise fails to negate probable cause, because, as of November 17, 2013, officers had only seen Ms. Stonestreet driving this vehicle. And, Mr. Maley is mistaken when he contends that officers knew nothing about his schedule or tendencies. Rather, they knew he was unemployed and thus had no fixed schedule, and also that on August 1, 2013, he had kept the trailer's blinds closed while he was in it.

More broadly, Mr. Maley argues that officers lacked probable cause to believe he would be found within his trailer on the morning of November 17, 2013, because the District of Arizona so held. (Doc. 350 at 7-9.) "According to the doctrine of issue preclusion, when an issue of ultimate fact has been once determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1093 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003) (quotation marks omitted). Issue preclusion can be used defensively or offensively, *i.e.*, to defend against a claim or to establish one. *See, e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979).

"[T]he party claiming the benefit of the doctrine of issue preclusion [has] the burden of establishing all facts necessary for its application." *Valley Imp. Ass'n, Inc. v. U.S. Fid. & Guar. Corp.*, 129 F.3d 1108, 1120 (10th Cir. 1997).

> [F]our elements must be shown: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been fully adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Adams*, 340 F.3d at 1093 (quotation marks omitted). Even when all of these elements are present, the decision whether to apply the doctrine is within the Court's discretion. *Arapahoe Cty. Pub.*

*Airport Auth. v. F.A.A.*, 242 F.3d 1213, 1220 (10th Cir. 2001); *see also Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1221 (10th Cir. 2013) ("[T]he decision to apply offensive collateral estoppel[9] lies within the court's broad discretion. It is not available as a matter of right.") (citation and quotation marks omitted).

In light of the foregoing standards, I recommend that the Court decline to apply issue preclusion to the District of Arizona decisions holding that officers lacked probable cause to believe Mr. Maley would be found within his trailer on the morning of November 17, 2013. First, Mr. Maley—the intended beneficiary of the doctrine—has been equivocal about invoking it. Though he does argue that the District of Arizona decisions "[s]hould [b]e [a]fforded [s]ubstantial [d]eference," he concedes that they "do[] not have full preclusive effect." (Doc. 350 at 7-8.) Nor has he even attempted to meet his burden of establishing the four elements of issue preclusion listed in *Adams*, 340 F.3d at 1093.

Second, the Government may not have had a full and fair opportunity to litigate the *Payton* issue in the District of Arizona. *Id.* In deciding whether a party had a full and fair opportunity to litigate an issue, courts "focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to [fully litigate] the issue, or whether effective litigation was limited by the nature or relationship of the parties." *Burrell v. Armijo*, 456 F.3d 1159, 1172–73 (10th Cir. 2006). "[A]mong the most critical guarantees of fairness in applying collateral estoppel is the guarantee that the party to be estopped had not only a full and fair

---

[9] "The terms 'collateral estoppel' and 'issue preclusion' are used interchangeably." *Moss v. Kopp*, 559 F.3d 1155, 1161 n.7 (10th Cir. 2009); *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 686 n.4 (10th Cir. 1992).

opportunity but an adequate incentive to litigate 'to the hilt' the issues in question." *Haring v. Prosise*, 462 U.S. 306, 311 (1983).

Given the procedural histories of Mr. Maley's related criminal cases, it is at least debatable whether the Government had an adequate incentive to litigate the *Payton* issue in the District of Arizona. By March 3, 2017, when Judge Bowman issued her Recommendation on Mr. Maley's motion to suppress, Mr. Maley had already been tried, convicted, and sentenced to 262 months' imprisonment in this Court, and his appeal to the Tenth Circuit was pending. (Docs. 142, 147, 193, 194); *Maley*, 2017 WL 8941236. As previously noted, Judge Bowman decided the *Payton* issue in Mr. Maley's favor but ultimately found against him, recommending denial of his motion to suppress on the basis that the evidence in question would have inevitably been discovered. *Id.* at *5-*6. Then, on March 9, 2017—before objections to Judge Bowman's Recommendation were due—the Tenth Circuit affirmed Mr. Maley's conviction in this case. *Maley*, 681 F. App'x at 685.

This series of events potentially undercut the Government's incentive to litigate the *Payton* issue at a critical juncture. After Judge Bowman issued her Recommendation, the Government had to decide whether to object to it. Two facts would have weighed against doing so, *i.e.*, the fact that Judge Bowman ultimately recommended a decision in the Government's favor, and the fact that Mr. Maley was already serving over twenty years' imprisonment on a conviction the Tenth Circuit had just affirmed. In light of these facts, it is at least understandable that the Government decided to devote its finite resources to endeavors other than objecting to Judge Bowman's recommendation regarding the *Payton* issue. Certainly, it seems unlikely that the Government had an adequate incentive to litigate that issue "to the hilt." *Haring*, 462 U.S. at 311.

Moreover, the Government's decision not to object to Judge Bowman's recommendation regarding the *Payton* issue substantially constrained subsequent appellate review of it. Because

the Government failed to object to Judge Bowman's recommendation on this point, Judge Zapata reviewed it only for "clear error" and included no analysis of it in his opinion.[10] *Maley*, 2017 WL 1830483 at *2. The Government's failure to object would have also restricted any Ninth Circuit review of Judge Zapata's decision adopting the recommendation. *See Bastidas v. Chappell*, 791 F.3d 1155, 1159 (9th Cir. 2015) (on appeal, "failure to object to a magistrate judge's factual findings waives the right to challenge those findings," and failure to object to her legal conclusions is "a factor to be weighed in considering the propriety of finding waiver of an issue") (quotation marks omitted). These constraints are noteworthy because, "[i]n significant part, preclusion doctrine is premised on an underlying confidence that the result achieved in the initial litigation was substantially correct." *Bravo-Fernandez v. United States*, — U.S. —, 137 S. Ct. 352, 358 (2016) (quotation marks omitted). However, in the absence of plenary appellate review, such confidence may be unwarranted. *Id.*

As previously discussed, whether to apply issue preclusion is within the Court's discretion, even when all of the required elements have been shown. *Arapahoe Cty. Pub. Airport Auth.*, 242 F.3d at 1220; *Wallace B. Roderick Revocable Living Tr.*, 725 F.3d at 1221. Here, Mr. Maley has refrained from expressly invoking the doctrine and has not tried to establish its elements. In addition, the record raises a genuine question regarding whether he would have been able to establish the full-and-fair-opportunity element had he tried. In these circumstances, I recommend that the Court decline to exercise its discretion to apply issue preclusion to the District of Arizona decisions regarding the *Payton* issue.

Mr. Maley does argue that the District of Arizona decisions, though not binding, should be afforded substantial deference because judges in that district are more familiar with Ninth Circuit

---

[10] In contrast, Judge Zapata reviewed Judge Bowman's recommendation regarding the inevitable discovery doctrine *de novo*, ultimately reversing it based on a substantive, reasoned analysis. *Maley*, 2017 WL 1830483 at *2-*5.

law.  However, even assuming Ninth Circuit law applies to the *Payton* issue in this case, greater familiarity with such law would not be uniquely useful.  The Ninth Circuit interprets *Payton*'s "reason to believe" standard to require probable cause.  *Gorman,* 314 F.3d at 1114-15.  Courts have addressed the concept of probable cause thoroughly and often, *see, e.g.*, *Wesby*, — U.S. —, 138 S. Ct. at 586, and have concluded that it is fluid, common-sense, and fact-specific.  *Id.*; *Diaz*, 491 F.3d at 1078; *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1453 (9th Cir. 1991).  As such, familiarity with Ninth Circuit law is less useful than familiarity with probable cause in general and the facts of the case in particular.  The judges of this Court are familiar with probable cause and have access to the records in both of Mr. Maley's criminal cases, including transcripts of his four-day trial before Judge Brack and two-day evidentiary hearing before Judge Bowman.  I therefore conclude that the judges of this Court are as well placed as those sitting in the District of Arizona to decide the *Payton* issue.

In short, I recommend that the Court neither consider itself bound by nor defer to the District of Arizona decisions regarding the *Payton* issue.  Rather, after carefully considering these decisions along with all of the other relevant circumstances, I respectfully maintain that officers had probable cause to believe Mr. Maley was residing and would be found within the travel trailer at 1920 West Gardner Lane when they entered it on the morning of November 17, 2013.[11]  As such, officers' entry into the trailer to try to execute the warrant for Mr. Maley's arrest was lawful under *Payton* as both the Ninth and Tenth Circuits have interpreted it, and a motion to suppress

---

[11] Notably, in the Recommendation Judge Zapata adopted, Judge Bowman wrote, "[i]f owning the home was a sufficient basis to believe a defendant was present, nothing more than ownership would be required for entry to serve the arrest warrant."  *Maley*, 2017 WL 8941236 at *5.  However, as discussed at some length above, many facts in addition to Mr. Maley's ownership of the trailer established a fair probability that he would be found within it on the morning of November 17, 2013.

evidence obtained as a result of the entry would have lacked merit. *Denson*, 775 F.3d at 1217;

*Gorman*, 314 F.3d at 1114-15.

For clarity, I note here that the evidence obtained as a result of officers' initial entry into

the trailer, as opposed to their subsequent seizure and search of it, consists of the incriminating

items officers observed in plain view while they were searching it for Mr. Maley. The "plain view"

doctrine permits the warrantless seizure of incriminating evidence if:

> (1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent—i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself.

*Harman v. Pollock*, 586 F.3d 1254, 1264 (10th Cir. 2009) (brackets omitted); *see also Horton v.*

*California*, 496 U.S. 128, 136-37 (1990) (same).

Agent Acee testified that, upon lawfully entering the trailer to try to arrest Mr. Maley, he

observed suspected methamphetamine, U.S. currency, and two pistols and a shotgun in plain view.

In particular, the parties have stipulated that the "Mossberg 12 gauge shotgun entered into evidence

at Mr. Maley's trial as Government Exhibit 9" was in plain view in the shower area of Mr. Maley's

trailer on the morning of November 17, 2013. (Doc. 376.) Agent Acee further testified that, before

he saw the pistols and shotgun, he knew Mr. Maley was a convicted felon and could not lawfully

possess firearms. Pursuant to the plain view doctrine, these incriminating items were subject to

warrantless seizure. *Horton*, 496 U.S. at 136; *Harman*, 586 F.3d at 1264.

That officers left these items in Mr. Maley's trailer for two days after seizing them does

not alter their admissibility. A defendant loses his Fourth Amendment possessory interest in an

obviously incriminating item once officers have lawfully observed it in plain view. *Horton*, 496

U.S. at 134, 136-37. Mr. Maley has identified, and I have located, no law holding that such an

item must nevertheless be suppressed if it is temporarily left in an unlawfully seized vehicle or other container.

Nor is there any principled reason to create such law here. The purpose of the exclusionary rule is to deter Fourth Amendment violations. *Davis v. United States*, 564 U.S. 229, 236-37 (2011). "Where suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted." *Id.* at 237 (quotation marks and ellipses omitted). Moreover, because "[e]xclusion exacts a heavy toll on both the judicial system and society at large, . . . the deterrence benefits of suppression must outweigh its heavy costs." *Id.* Here, officers left incriminating items in plain view in Mr. Maley's trailer so that they could obtain a warrant to search the trailer—a warrant they did not need to lawfully seize the items. In these circumstances, to create a rule requiring the items' suppression would yield no deterrent benefit at all, much less sufficient benefit to outweigh the inordinately heavy costs. For all of the above reasons, a motion to suppress evidence in plain view when officers entered Mr. Maley's trailer would have lacked merit, and Mr. Maley's claim that his trial counsel were ineffective for failing to file such a motion must fail. *Kimmelman*, 477 U.S. at 375.

> ### 2. <u>There is no reasonable probability that the verdict would have been different had evidence obtained from the seizure and search of Mr. Maley's trailer been suppressed</u>.

Mr. Maley also argues that his trial counsel were ineffective because they failed to file a motion to suppress evidence obtained as a result of officers' seizure and search of his trailer. (Doc. 290 at 15-17; Doc. 309 at 8-14.) As an initial matter, Mr. Maley is correct that officers' seizure of the trailer was unlawful. Agents relied on 18 U.S.C. § 981 and 21 U.S.C. § 881 to justify the seizure. (Cr. No. 14-637, Doc. 61 at 118-20); *Maley*, 2017 WL 1830483 at *3. In relevant part, 21 U.S.C. § 881 provides that

> [a]ll conveyances, including . . . vehicles . . . which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt,

possession, or concealment of [unlawful controlled substances] shall be subject to forfeiture to the United States and no property right shall exist in them.

21 U.S.C. § 881(a)(4). The statute further provides that such property "may be seized . . . in the manner set forth in [18 U.S.C. § 981(b)]." 21 U.S.C. § 881(b). Section 981(b), in turn, permits federal agents to seize property without a warrant if "there is probable cause to believe that the property is subject to forfeiture," and "the seizure is made pursuant to a lawful arrest or search" or "another exception to the Fourth Amendment warrant requirement would apply[.]" 18 U.S.C. § 981(b)(2)(B).

Mr. Maley argues that officers' warrantless seizure of his trailer violated 18 U.S.C. § 981(b) because it was not made pursuant to a lawful arrest or search, and no other exception to the Fourth Amendment warrant requirement applied. (Doc. 290 at 15-19; Doc. 350 at 6-7.) The Government responds that the seizure was lawful pursuant to the automobile exception. (Doc. 298 at 9-10.) "When federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband." *United States v. Mercado*, 307 F.3d 1226, 1228 (10th Cir. 2002) (quoting *Florida v. White,* 526 U.S. 559, 563–64 (1999)). The automobile exception arises from automobiles' "ready mobility" and the fact that a person's "expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *California v. Carney*, 471 U.S. 386, 391 (1985); *see also Mercado*, 307 F.3d at 1228 (automobile exception is based on "the inherent mobility of cars . . . and the fact that there is a reduced expectation of privacy with motor vehicles"); *United States v. DeJear*, 552 F.3d 1196, 1202 (10th Cir. 2009) (automobile exception is based on "mobility" and "reduced expectations of privacy").

In *Carney*, the Supreme Court applied the automobile exception to a motor home, which, like a car, is readily mobile and subject to pervasive regulation, but, unlike a car, is also designed

to serve as a residence.  471 U.S. at 393-94.  The defendant in *Carney* was arrested for exchanging

marijuana for sex in a motor home parked in a public lot.  *Id.* at 387-88.  After a witness confirmed

that the defendant had given him marijuana in exchange for sex, officers entered and searched the

motor home without a warrant, finding drugs and drug paraphernalia inside.  *Id.* at 388.  The

defendant, who was charged with possession of marijuana for sale, moved to suppress the evidence

found in the motor home.  *Id.*

The Supreme Court concluded that the automobile exception justified the officers'

warrantless search.  *Id.* at 389, 394.  The Court rejected a blanket distinction between ordinary

vehicles and those that can also be used as a residence, reasoning that,

> [i]n our increasingly mobile society, many vehicles used for transportation can be
> and are being used not only for transportation but for shelter, *i.e.,* as a "home" or
> "residence." To distinguish between respondent's motor home and an ordinary
> sedan for purposes of the vehicle exception would require that we apply the
> exception depending upon the size of the vehicle and the quality of its
> appointments. Moreover, to fail to apply the exception to vehicles such as a motor
> home ignores the fact that a motor home lends itself easily to use as an instrument
> of illicit drug traffic and other illegal activity.

*Id.* at 393-94.

Instead, the Court recognized "two requirements for application of the [automobile]

exception," *i.e.*, "the ready mobility of the vehicle," and "the presence of the vehicle in a setting

that objectively indicates that the vehicle is being used for transportation."  *Id.* at 394.  Applying

these requirements to the facts before it, the Court concluded that the *Carney* defendant's motor

home was readily mobile, licensed to operate on public streets, subject to extensive regulation and

inspection, and "so situated that an objective observer would conclude that it was being used not

as a residence, but as a vehicle."  *Id.* at 393.  However, the Supreme Court did not

> pass on the application of the vehicle exception to a motor home that is situated in
> a way or place that objectively indicates that it is being used as a residence. Among
> the factors that might be relevant in determining whether a warrant would be
> required in such a circumstance is its location, whether the vehicle is readily mobile

or instead, for instance, elevated on blocks, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road.

*Id.* at 394 n.3.

In *United States v. Hamilton*, the Ninth Circuit also applied the automobile exception to a motor home. 792 F.2d 837, 843 (9th Cir. 1986), *disapproved of on other grounds by United States v. Kim*, 105 F.3d 1579 (9th Cir. 1997). In so doing, the court observed that

> [t]he mobility of the motor home is amply demonstrated by the fact that it was moved the night before the search was conducted. Although the registration had lapsed, the motor home was licensed with the State of California. Because it was located in a residential driveway, it had easy access to a public road. The fact that the motor home was attached to "utilities" in the broad sense is not very significant. A connection to electrical utilities by means of an extension cord is hardly the kind of "pipe and drain" connection that would render the motor home more permanent and less mobile as was contemplated by the Court in *Carney*.

*Id.*; *see also United States v. Ervin*, 907 F.2d 1534, 1538–39 (5th Cir. 1990) (applying automobile exception to travel trailer parked in motel parking lot); *United States v. Markham*, 844 F.2d 366, 369 (6th Cir. 1988) (applying automobile exception to motor home licensed in Tennessee, located in a driveway in Ohio, and not connected to any utility lines).

The Tenth Circuit has not considered whether to apply the automobile exception to a motor home or travel trailer after *Carney*. It has, however, applied the exception to another vehicle "of [a] hybrid character," *i.e.*, a houseboat. *United States v. Hill*, 855 F.2d 664, 668 (10th Cir. 1988). The *Hill* court concluded that *Carney*'s requirements had been met because the houseboat was readily mobile and in a setting that objectively indicated it was being used for transportation. *Id.* As the court noted, "an objective observer would conclude that a moving boat navigating the waters of a large lake on a cold winter night was not being used as a residence." *Id.* In *United States v. Albers*, the Ninth Circuit "agree[d] with the Tenth Circuit," holding "that the vehicle exception applies to houseboats so long as *Carney*'s requirements are met." 136 F.3d 670, 673 (9th Cir. 1998), *as amended on denial of reh'g* (Mar. 20, 1998).

Applying this line of cases to the facts at issue here, I agree with Mr. Maley that the automobile exception did not apply to his trailer when officers seized it on November 17, 2013. Regarding the first *Carney* requirement, although the trailer was not "inherently" mobile in the sense of having its own engine, it was "readily" mobile in the sense that it could be moved fairly quickly. Thus, for example, the trailer was parked in Las Cruces in August 2013 but in Tucson by November of that year; and, officers were able to tow it from 1920 West Gardner Lane to the Tucson FBI office well within the space of a day.

However, on November 17, 2013, Mr. Maley's trailer did not meet the second *Carney* requirement for application of the automobile exception, because it was "situated in a way or place that objectively indicate[d] that it [was] being used as a residence," rather than as transportation. *Carney*, 471 U.S. at 394 & n.3. The trailer was parked on a lot off a one-lane dirt road in a trailer park, disconnected from the truck equipped to tow it, and elevated on a block. Its awning and stairs were out; the slide outs had been extended; and, it was connected to power, water, and a septic system.[12] Its blinds were drawn and a surveillance camera in the window pointed at the area outside the door. It had been in the same place and condition more than a week earlier. In these circumstances, the automobile exception cannot justify officers' seizure and search of it.

The foregoing suggests that a motion to suppress evidence obtained as a result of officers' seizure and subsequent search of Mr. Maley's trailer would have been meritorious.[13] However,

---

[12] Although Mr. Maley's trailer, like the *Hamilton* motor home, was connected to electricity by an extension cord, it was also connected to water and a septic system, which the *Hamilton* motor home was not. 792 F2d at 843.

[13] The Government has not disputed that officers' search of Mr. Maley's trailer on November 19, 2013 arose directly out of their November 17, 2013 seizure of it. (*See generally* Docs. 298, 315, 357.) Evidence obtained from the search was thus inadmissible as "fruit of the poisonous tree." *See Utah v. Strieff*, — U.S. —, 136 S. Ct. 2056, 2061 (2016) ("[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'") (quotation marks omitted).

the *Strickland* prejudice inquiry does not end there. Rather, to show prejudice under *Strickland* and its progeny, Mr. Maley must also demonstrate a reasonable probability that the verdict against him would have been different had evidence obtained from the unlawful seizure and search been suppressed. *Kimmelman*, 477 U.S. at 375; *see Strickland*, 466 U.S. at 695 ("When a defendant challenges a conviction the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."). For the reasons explained below, there is no reasonable probability that the verdict against Mr. Maley would have been different without the inadmissible evidence at issue.

The trial evidence obtained as a result of officers' seizure and search of Mr. Maley's trailer can be divided into two categories. In the first category are eight firearms found in the trailer, not in plain view, that were admitted into evidence as Government's Exhibits 7, 8, and 10 through 15. (Doc. 163 at 62-72; Doc. 376.) Mr. Maley was charged with only one count relating to firearms, *i.e.*, Count 14. At trial, the Court instructed the jury that, to find Mr. Maley guilty of this count,

> you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> *First*:  the defendant knowingly possessed *a firearm*;
>
> *Second*:  the defendant was convicted of a felony . . . before he possessed *the firearm*; and
>
> *Third*:  before the defendant possessed *the firearm*, *the firearm* moved at some time from one state to another.

(Doc. 143 at 23 (emphases added).)[14]

---

[14] During the pendency of this Section 2255 proceeding, the Supreme Court decided *Rehaif v. United States*, — U.S. —, 139 S. Ct. 2191 (2019), in which it held that, to obtain a conviction under 18 U.S.C. §§ 922(g) and 924(a), the Government "must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Id.* at 2200. However, at the time of his trial, the Government was not required to prove that Mr. Maley knew he had been convicted of a felony. *See United States v. Games-Perez*, 667 F.3d 1136, 1141-42 (10th Cir. 2012); *United States v. Capps*, 77 F.3d 350, 351-352 (10th Cir. 1996).

The admissible evidence presented at trial was wholly sufficient to support the jury's verdict finding Mr. Maley guilty of this count beyond a reasonable doubt. The shotgun officers saw in plain view when they lawfully entered Mr. Maley's trailer to execute the warrant for his arrest was admitted into evidence as Government's Exhibit 9. As previously noted, this evidence was admissible pursuant to the plain view doctrine. *Horton*, 496 U.S. at 136-37; *Harman*, 586 F.3d at 1264. The Government also offered Ms. Stonestreet's testimony that Mr. Maley possessed the shotgun when she and Mr. Maley lived together in New Mexico, and evidence that Mr. Maley was a convicted felon before he possessed it. Finally, Agent Acee testified that the shotgun was not manufactured in New Mexico and thus necessarily moved from one state to another before Mr. Maley possessed it here. The Government having proved all of the elements of the charged violation of 18 U.S.C. § 922(g)(1) via the admissible shotgun, the eight inadmissible firearms were surplus to these requirements. There is thus no reasonable probability that the jury's verdict on Count 14 would have been different had these eight firearms been suppressed.

Nor can Mr. Maley show that his counsel's failure to file a suppression motion with respect to the inadmissible firearms prejudiced him at sentencing, for two reasons. Initially, although the offense level assigned to Mr. Maley's felon-in-possession conviction was adjusted upward because he was held accountable for eight firearms, this offense level was then discarded in favor of the higher offense level assigned to his drug-related convictions in calculating his total adjusted offense level.[15] Further, the suppression remedy is unavailable in the sentencing context unless there is evidence that officers' unlawful actions were done with the intent to secure an increased sentence. *United States v. Ryan*, 236 F.3d 1268, 1271-72 (10th Cir. 2001). Here, Mr. Maley has

---

[15] This information is reflected in Mr. Maley's Pre-Sentence Investigation Report ("PSR"). As a matter of practice, PSRs are not filed of record in this district; however, I have reviewed Mr. Maley's PSR, and the Government and Mr. Maley both have access to it as parties to Mr. Maley's criminal case.

neither argued nor pointed to the existence of any evidence that officers seized and searched his trailer with the intent to secure an increased sentence. In short, the Government's introduction of the eight inadmissible firearms into evidence did not prejudice Mr. Maley.

The second category of trial evidence obtained as a result of officers' seizure and search of Mr. Maley's trailer consists of documents and photographs. As the Government observes, the documents found in the trailer and admitted into evidence at trial were quotidian items—insurance policies, receipts, vehicle titles, and criminal history records—that were available to officers through other channels and not directly inculpatory. (Doc. 298 at 13-14; *see* Doc. 163 at 73-74, 82-99.) In addition, the Government introduced as demonstrative exhibits photographs officers took of the trailer when they searched it. (Doc. 163 at 57-59.) Mr. Maley has made no attempt to show a reasonable probability that the verdict against him would have been different had these documents and photographs been suppressed. (*See generally* Docs. 290, 309, 326, 350, 359.) Moreover, in light of the overwhelming directly inculpatory evidence supporting the verdict against him, he would have been unable to make such a showing had he tried.

However, Mr. Maley does argue that other documents and photographs officers found in the trailer evidenced a connection between himself, Mr. Niño, and Ms. Carpenter, that officers would not have known of such a connection without them, and that the verdict against him would have been different without Mr. Niño's and Ms. Carpenter's trial testimony. (Doc. 309 at 9-14; Doc. 326 at 2-3.) In response, the Government relies on the independent source doctrine, pointing to evidence that agents were aware of a connection between Mr. Maley and Mr. Niño well before they searched Mr. Maley's trailer. (Doc. 315 at 1-4.) The Government also relies on the inevitable discovery doctrine, pointing to evidence that agents would have learned of Mr. Maley's connection

with Ms. Carpenter through her December 2013 delivery of methamphetamine to Mr. Niño, regardless of anything found in Mr. Maley's trailer.  (*Id.*)

According to the Tenth Circuit,

[t]he independent source doctrine permits courts to admit evidence notwithstanding a prior illegality if law enforcement acquired the incriminating evidence from a separate, independent source.  The inevitable discovery doctrine countenances the admission of evidence that would have been discovered regardless of prior police illegality.

*United States v. Shrum*, 908 F.3d 1219, 1235 (10th Cir. 2018) (citation omitted); *see also United States v. Christy*, 739 F.3d 534, 541 (10th Cir. 2014) (pursuant to inevitable discovery doctrine, otherwise inadmissible evidence "is admissible if it would be discovered 'by lawful means' or 'without reference to the police error or misconduct'").

Regarding Mr. Niño, Agent Acee conducted undercover methamphetamine buys from Ms. Savage and Ms. Sanders from June to August 2013; officers saw Ms. Savage and Ms. Sanders go to Mr. Niño's trailer to get methamphetamine to sell to Agent Acee in the summer of 2013; and, Agent Acee saw Ms. Sanders go to Mr. Maley's trailer to get methamphetamine to sell to Agent Acee on August 1, 2013.  As such, officers had reason to believe that Mr. Maley and Mr. Niño were involved in the same methamphetamine trafficking organization months before they seized and searched Mr. Maley's trailer.  I therefore find that officers obtained incriminating evidence of Mr. Maley's and Mr. Niño's connection from a separate and independent source.

Regarding Ms. Carpenter, after agents failed to arrest Mr. Maley on November 17, 2013, they tried to draw him out by having a confidential informant buy a larger amount of methamphetamine from Mr. Niño.  Officers set up surveillance at Mr. Niño's residence and obtained a warrant to search it based on the informant's report that Mr. Niño expected the methamphetamine to be delivered on December 4, 2013.  On that date, officers observed Ms.

Carpenter's vehicle arrive at Mr. Niño's residence and leave again, whereupon they simultaneously stopped Ms. Carpenter's vehicle and searched Mr. Niño's residence, finding methamphetamine at the residence. Officers detained and questioned Ms. Carpenter, and she disclosed incriminating information regarding her connection with Mr. Maley. Through this series of events, officers would have inevitably discovered Mr. Maley's incriminating association with Ms. Carpenter on December 4, 2013, regardless of any information they obtained during the prior unlawful seizure and search of Mr. Maley's trailer. The independent source and inevitable discovery doctrines therefore dictate that Mr. Niño's and Ms. Carpenter's trial testimony against Mr. Maley was not subject to suppression.

Mr. Maley has identified no other evidence used against him at trial that he claims officers obtained as a result of their unlawful seizure and search of his trailer and there is no reasonable probability that the verdict against Mr. Maley would have been different had his trial counsel successfully filed a motion to suppress such evidence. For all of the above reasons, the record conclusively demonstrates that Mr. Maley cannot satisfy *Strickland*'s prejudice prong with respect to his ineffective assistance of counsel claims based on his trial counsel's failure to file a motion to suppress, and these claims should be denied. *See Barrett*, 797 F.3d at 1214 ("[F]ailure under either [*Strickland* prong] is dispositive.").

**B.**     **Mr. Maley received effective assistance of counsel at sentencing**.

For the first time in his reply in support of his Section 2255 Motion, Mr. Maley argues that his counsel provided him with ineffective assistance at sentencing by failing to object to the quantity of drugs attributed to him in the PSR. (Doc. 309 at 12-13.) In addition to being

improperly raised for the first time in his reply,[16] this argument is without merit.  Mr. Maley asserts

that his counsel should have objected to the inclusion of methamphetamine purchased from Ms.

Savage, Ms. Sanders, and Mr. Niño in the quantity of drugs attributed to Mr. Maley.  (*Id.*)

However, as the Government correctly observes, "conspirators who are integral to an entire

conspiracy can be sentenced at the conspiracy-wide drug amount."  *United States v. Ellis*, 868 F.3d

1155, 1176 (10th Cir. 2017), *cert. denied*, — U.S. —, 138 S. Ct. 1038 (2018) (quotation marks

omitted).

Here, Ms. Sanders and Mr. Niño testified that Ms. Savage obtained methamphetamine from

Ms. Sanders, Ms. Sanders obtained it from Mr. Niño, and Mr. Niño obtained it from Mr. Maley.

Moreover, on the one occasion Ms. Sanders obtained methamphetamine directly from Mr. Maley,

he instructed her not to bypass Mr. Niño again, evidencing that he was a leader of the drug

conspiracy in which all three were involved.   Mr. Maley was thus "integral" to the

methamphetamine distribution conspiracy of which he was convicted and properly sentenced "at

the conspiracy-wide drug amount."  *Id.*  Mr. Maley's counsel's decision not to object to the

attribution of drug quantities to Mr. Maley at sentencing was objectively reasonable and did not

constitute deficient performance under *Strickland*, 466 U.S. at 687-88.

## C. **Mr. Maley received effective assistance and was not prejudiced by counsel's performance on appeal**.

Mr. Maley next argues that his appellate counsel provided him with ineffective assistance

because she failed to argue on direct appeal that officers' entry into and seizure and search of his

trailer violated the Fourth Amendment.  (Doc. 290 at 7, 20-21; Doc. 309 at 15-16.)  As with his

ineffective assistance claims regarding trial counsel, Mr. Maley must demonstrate both

---

[16]  By rule, Mr. Maley should have included all grounds for relief available to him in his original Section 2255 Motion. *See* R. Governing § 2255 Proceedings, R. 2(b) (Section 2255 motion must "specify all grounds for relief available to the moving party" and must "state the facts supporting each ground").

incompetence and prejudice to establish his ineffective assistance claims regarding appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). However, appellate counsel's decision to omit the suppression issue from Mr. Maley's appeal did not prejudice him for the same reasons trial counsel's failure to file a suppression motion did not do so. Mr. Maley's ineffective assistance of counsel claims regarding appellate counsel are subject to denial on this basis alone.

In addition, appellate counsel's decision to omit the suppression issue from Mr. Maley's appeal was not deficient. Judicial review of appellate counsel's decision to omit an issue on appeal

> must be highly deferential to counsel's conduct. Every effort must be made to evaluate the conduct from counsel's perspective at the time, and counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*United States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009) (citation, quotation marks, and brackets omitted). In the Sixth Amendment context, "[t]he omission of a 'viable' issue" on appeal "does not in and of itself constitute ineffective assistance of counsel." *Id.* This is because the "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Id.* (quotation marks omitted). However, counsel's omission of a "dead-bang winner" is deficient performance within the meaning of *Strickland*. *Id.* A "dead-bang winner" is "an issue which was obvious from the trial record *and* one which would have resulted in a reversal on appeal." *Id.* (emphasis in original).

Here, the Fourth Amendment suppression issue was not a "dead-bang winner" on appeal. Because it was not raised before the trial court, the Tenth Circuit would not have considered it absent a showing of good cause for why it was not timely raised. *United States v. Burke*, 633 F.3d 984, 988 (10th Cir. 2011); *see United States v. Ingram*, 721 F. App'x 811, 815 (10th Cir.), *cert. denied,* 138 S. Ct. 1602 (2018) (suppression motion not raised before trial is "untimely" and may

be considered only "if the party shows good cause"). Appellate counsel did "consider[] raising ineffective assistance of counsel on appeal" to show good cause for Mr. Maley's failure to pursue a suppression motion before trial. (Doc. 298-1 at 11.) However, she determined that "the facts necessary to support this claim were outside of the record on direct appeal," and was concerned about the risk that an unfavorable decision on direct appeal would later bar Mr. Maley from pursuing the claim under 28 U.S.C. § 2255. (*Id.* at 11-12); *see Abernathy v. Wandes*, 713 F.3d 538, 549 (10th Cir. 2013) ("[U]nder the law-of-the-case doctrine, courts ordinarily . . . refuse to reconsider arguments presented in a § 2255 motion that were raised and adjudicated on direct appeal."). She therefore decided that "the better course of action was to wait to raise ineffective assistance of counsel until the record could be supplemented to support a motion filed pursuant to § 2255." (Doc. 298-1 at 12.)

The record establishes that appellate counsel's decision to omit the suppression issue from Mr. Maley's appeal was a "strategic choice[] made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. As such, it is "virtually unchallengeable." *Id.* In short, Mr. Maley's appellate counsel's decision not to raise the suppression issue on direct appeal was neither deficient nor prejudicial.

**D.**     **Mr. Maley's *Brady* and *Giglio* claims are time-barred**.

For the first time in his surresponse in support of his Section 2255 Motion, Mr. Maley claims that the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), by failing to inform his counsel or the jury that Ms. Carpenter was an informant in two other cases, Mr. Niño had previously been convicted of two federal drug crimes, and the Government agreed to reduce Ms. Carpenter's and Mr. Niño's sentences in exchange for their testimony against Mr. Maley. (Doc. 326 at 1-2.) Setting aside the questionable accuracy of

Mr. Maley's allegations, Mr. Maley's *Brady* and *Giglio* claims are untimely. Section 2255 claims must be filed within one year of "the date on which the judgment of conviction becomes final."[17] 28 U.S.C. § 2255(f)(1). "For the purpose of starting the clock on § 2255's one-year limitation period, . . . a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction." *Clay v. United States*, 537 U.S. 522, 525 (2003).

The Tenth Circuit affirmed Mr. Maley's conviction in this case on March 9, 2017, and the time for him to file a certiorari petition expired 90 days later, *i.e.*, on June 7, 2017. S. Ct. R. 13(1). Section 2255's one-year statute of limitation therefore expired on June 7, 2018. However, Mr. Maley did not file his surresponse asserting *Brady* and *Giglio* claims until June 25, 2018. (Doc. 326.) Moreover, these claims do not relate back to the time of filing of Mr. Maley's original Section 2255 Motion because they are "totally separate and distinct, in both time and type from those raised in his original motion." *United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000) (quotation marks omitted); *see Mayle v. Felix*, 545 U.S. 644, 664 (2005) (supplemental claims brought under Section 2255 relate back to original Section 2255 motion if original and amended claims "are tied to a common core of operative facts"). Mr. Maley's *Brady* and *Giglio* claims are therefore time-barred.

E.    **The Government's motion to strike is moot.**

In its Motion to Strike Response to Surreply, the Government argues that the Court should strike Defendant's surresponse filed on June 25, 2018, (Doc. 326), because the Government's

---

[17] There are other dates from which Section 2255's one-year limitation period may run but none of them apply in this instance. *See* 28 U.S.C. § 2255(f)(2)-(4) (one-year limitation period for filing Section 2255 motions may run from the date an unlawful impediment created by governmental action is removed, the date the Supreme Court initially recognized a newly recognized and retroactively applicable right asserted, or the date on which the facts supporting the claim could have been discovered through due diligence).

surreply contained no new information and Local Rule 7 did not authorize a surresponse to it. (Doc. 329 at 1); *cf.* D.N.M. LR-Civ. 7.4(b) ("The filing of a surreply requires leave of the Court."). If the Court adopts my recommendation to deny Mr. Maley's Section 2255 Motion notwithstanding the arguments he raised in his surresponse, the Government's motion to strike will be moot and should therefore be denied.

## V. <u>Conclusion</u>

Mr. Maley has failed to satisfy *Strickland*'s requirements with respect to his claims that his trial counsel provided him with constitutionally ineffective assistance by failing to file a motion to suppress evidence obtained as a result of officers' entry into and seizure and search of his trailer. A motion to suppress evidence obtained as a result of officers' entry into Mr. Maley's trailer would have lacked merit. Also, there is no reasonable probability that the verdict against Mr. Maley would have been different had his trial counsel filed a motion to suppress evidence obtained as a result of officers' unlawful seizure and search of the trailer. Thus, trial counsel's performance, whether deficient or not, did not prejudice Mr. Maley. Also, counsel's failure to object to the quantity of drugs attributed to Mr. Maley at sentencing was objectively reasonable. I therefore recommend that Mr. Maley's Sixth Amendment claims that his counsel provided him with ineffective assistance at trial and sentencing be denied.

Mr. Maley has also failed to satisfy *Strickland*'s requirements with respect to his claims that his appellate counsel provided him with constitutionally ineffective assistance by failing to raise the suppression issue on direct appeal. Appellate counsel's decision to omit the suppression issue, like trial counsel's failure to file a suppression motion, did not prejudice Mr. Maley. In addition, appellate counsel's decision to omit the suppression issue from Mr. Maley's appeal was

objectively reasonable.  As such, I recommend denial of Mr. Maley's Sixth Amendment ineffective assistance of counsel claim regarding his appellate counsel as well.

Finally, Mr. Maley's claims that the Government violated *Brady* and *Giglio* at trial are time-barred and I therefore recommend that these claims be denied.

Because the motion, files, and records conclusively show that Mr. Maley is entitled to no relief, 28 U.S.C. § 2255(b), I recommend that Mr. Maley's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 290) be DENIED without a hearing.

I further recommend that the Government's Motion to Strike Response to Surreply (Doc. 329) be DENIED AS MOOT.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**